**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00272 (TJK)** |
| **v.** | : | |
| | : | |
| **JORDAN KENNETH STOTTS,** | : | |
| | : | |
| Defendant. | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the Acting United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jordan Stotts to 45 days of incarceration and $500 in restitution.

**I.      Introduction**

The defendant, Jordan Kenneth Stotts, a resident of Moorhead, Minnesota, drove from Arizona to Washington, D.C. to participate in the January 6, 2021 attack on the United States Capitol.  That attack disrupted the Congressional certification of the 2020 Electoral College vote count for hours, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars of property damage.

Stotts pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.  As explained herein, a sentence of 45 days of incarceration is appropriate in this case because:  (1) the defendant stood face-to-face with and shouted at Metropolitan Police Department officers while they were pushing back rioters, including the defendant at least three times, out of the Capitol Rotunda; (2) he scaled the wall on the Upper West Terrace to gain access to the Capitol, and once inside he raised his fist in support

1

of those who breached the Capitol Building; (3) his post-riot statements on Facebook, in which he boasted about the "siege," claimed the fight was "far from over," and exclaimed, "I'll be back," reveal a total lack of remorse; and (4) those statements suggest that Defendant might engage in similar unlawful conduct in the future.   This conduct merits a custodial sentence, even though Stotts did not personally strike the officers or destroy any property, and even though he promptly accepted responsibility after charges were brought against him.

The Court must also consider that Stotts' conduct on January 6, like that of hundreds of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement officials, breach the Capitol, and disrupt the Congressional proceedings.   But for his actions alongside many others, the riot might not have succeeded in substantially delaying the certification vote. Stotts' eager participation in a riot that delayed the Congressional certification vote for hours, combined with his celebration and endorsement of the violence on that day, his lack of remorse, and the potential for future violence renders a sentence of 45 days of incarceration both necessary and appropriate in this case.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 20 (Statement of Offense) ¶¶ 1-7.  As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent— contributed, directly and indirectly, to the violence and destruction of that day.

*Stotts' Role in the January 6, 2021 Attack on the Capitol*

On January 4, 2021, Stotts drove alone from Arizona to Washington, D.C.  *See* ECF 20 ¶ 8.  Starting at approximately 8:30 a.m., on January 6, he attended the rally for then-President

Trump.  *Id.* ¶ 9.  At approximately 2:00 p.m., Stotts marched with other rally attendees to the Capitol Building and climbed onto a balcony and chanted with the crowd.  *Id.* ¶ 10.  His scaling of the Upper West Terrace wall, as captured by Associated Press photographer Jose Luis Magana and published by numerous media outlets around the world, is one of the indelible images of January 6.



At approximately 2:45 p.m., he entered the Capitol Building.  *Id.* ¶ 11.  Once inside the Capitol Building, Stotts walked around the inside lobby of the Rotunda doors chanting, raising his fist, and pounding his chest as he watched rioters storm through the doors and push law enforcement officers out of their way.  Stotts is the person inside the red framing in the following photographs.





Stotts also paraded around the Rotunda, using his cell phone to record photos and video, and raising his fist in support of the crowd's conduct.



At approximately 3:02 p.m., officers from the Metropolitan Police Department entered the Rotunda wearing riot gear and carrying batons.  The officers worked together, standing shoulder to shoulder, trying to force the rioters out of the Rotunda.  The officers shouted commands, directing the rioters to leave the Rotunda.  If rioters got too close to the officers, the officers used their batons to push them back.

At approximately 3:07 p.m., Stotts made his way to the front of the crowd confronting the officers.  One officer's body-worn camera recorded Stotts.  The relevant portion of the video is provided to the Court as Exhibit 1.  In the video, Stotts is seen shouting at the officers, "O say, does that star-spangled banner yet wave!  O'er the land of the free and the home of the brave!"  One officer pushed Stotts back at least three times but Stotts remained where he was and stared down the officers.  He then shouted at the officers, "We're here to take back our country for ya'll!  All of us!  All Americans!  We're on the same team!  Same team!"  Another rioter near Stotts can be heard shouting, "Push!  Push against them!"



By approximately 3:20 p.m., law enforcement officers finally cleared the Rotunda of the rioters and escorted them out of the building. Stotts spent approximately one hour inside the Capitol Building. *Id.* ¶ 12. He admitted he knew at the time he entered the Capitol Building that he did not have permission to do so and that he entered the building with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress. *Id.* ¶ 14.

*Social Media Posts*

In the hours after Stotts left the Capitol Building, he posted several statements to his Facebook account. One stated:

> For too long our voices have gone unheard! For too long our lives have been slowly taken! For too long has Satan ran this country! They attack our religious freedom, freedom of speech, and our freedom to do as we please! They work for us and have no right

telling us what we can and can't do!  I'm sick of it and so are the Patriots!  With God on our side we will prevail!

A second post stated:

The story of the siege:  It all started by scaling a wall as we broke into the U.S. Capital to strike fear into the sold out Congress.  We were tear gassed and 2 people were shot.  We were peaceful but the police were not.  Police were aggressive and on the wrong side!  They got us out but it's far from over!  1776!



Stotts also posted a photograph of the Capitol Building to his Facebook page that bore the caption, "Patriots!  I got kicked out but I'll be back!"



*FBI Interview of Stotts*

Prior to Stotts' arrest in March 2021, FBI agents interviewed Stotts. On January 18, 2021, he gave a voluntary statement to the agents. During that interview, Stotts stated he was travelling in Arizona when he decided he wanted to attend the January 6 rally. He had been a supporter of then-President Trump and believed the President wanted supporters to come to Washington, D.C. to support him. He stated that he drove his van from Arizona to Florida, then drove to Washington, D.C., arriving on January 4. He stayed in his van overnight at a state park in Virginia, then attended the rally in Freedom Plaza on January 6.

Stotts stated that after the President finished speaking at approximately 1:00 or 2:00 p.m., he walked to the Capitol Building with other rally attendees. He claimed he did not see any law enforcement officers when he arrived at the Capitol Building. He also claimed he entered the building through a door on the west side of the building that was open. Stotts admitted that he walked around the Rotunda. He also admitted that at one point the rioters were pushing up against the officers in riot gear. He admitted that he remained on the Capitol grounds for a couple of hours. He admittedly saw rioters throwing things at police officers and saw one rioter kick in an exterior window to the Capitol Building. He stated that he exited the building in compliance with the officers' commands. At approximately 5:45 p.m., he returned to his van. During the interview, Stotts told the agents that in retrospect, he knew he should not have gone into the Capitol Building.

*The Charges and Plea Agreement*

On March 16, 2021, the government charged Stotts by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On April 2, 2021, the government charged Stotts in a four-count Information with the same crimes. On July 28, 2021, Stotts pleaded guilty pursuant to a plea agreement to Count Four of the Information, charging him with a violation

of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building.  Stotts agreed to pay $500 in restitution to the Department of the Treasury.

## III.  Statutory Penalties

Stotts faces sentencing on a single count of violating 40 U.S.C.  § 5104(e)(2)(G).  He faces a maximum prison sentence of six months and a maximum fine of $5,000.[1]  He must also pay restitution pursuant to his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).  As Stotts' offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.  Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, the Court must apply the sentencing factors set forth in 18 U.S.C. § 3553(a).  Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6).  As explained herein, a reasonable balancing of the § 3553(a) factors weigh in favor of a sentence of 45 days of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 was a crime unparalleled in American history.  It was only the second time in our history when the building was occupied by persons hostile to the American government.

---

[1] Because the defendant has pled guilty to a petty offense, a term of supervised release is not authorized. *See* 18 U.S.C. § 3583(b)(3).

While each defendant should be sentenced based on their individual conduct, every person who unlawfully entered the Capitol Building on January 6 did so knowing—at a minimum—that they crossed through numerous barriers and barricades bearing signs forbidding ingress and heard the ructions of a mob.  Depending on the timing and location of their approach, they also may have observed extensive fighting with police officers and smelled chemical irritants wafting in the air. No rioter was a mere tourist that day.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 (statement of Judge Chutkan "A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.").

In fashioning an appropriate sentence, this Court should consider, *inter alia*,: (1) whether, when, how Stotts entered the Capitol Building; (2) whether Stotts engaged in any violence or encouraged violence; (3) whether Stotts engaged in any acts of destruction or encouraged destruction; (4) Stott's reaction to acts of violence or destruction committed by others; (5) whether, during or after the riot, Stotts destroyed evidence; (6) the duration of Stotts' time inside the building, and exactly where he traveled; (7) Stott's statements in person or on social media; (8) whether Stotts cooperated with, or ignored, law enforcement officers at the scene of the riot; and (9) whether Stotts has expressed sincere remorse for his conduct on January 6th.  While these factors are neither exhaustive nor dispositive, they are highly informative in determining a defendant's relative culpability vis-à-vis the other charged rioters.

Stotts drove over 2,000 miles across the country, without assistance, to participate in the January 6 riot at the Capitol.  Once there, he scaled a wall to gain entry while a mob cheered for him.  Although Stotts implausibly claimed that he did not see any police officers outside of the Capitol Building before entering, he admittedly saw them inside the building and cheered on the

crowd as they stormed past the officers trying to block the Rotunda doors.  Despite seeing this, Stotts chose not to exit the building.  Rather, he went back into the Rotunda.  Most troubling, when Metropolitan Police Department officers entered the Rotunda wearing riot gear and carrying batons, Stotts ignored their commands to exit.  Instead, he confronted the officers, shouted in their faces, and stood his ground in the face of their orders to leave the Rotunda.  Although that conduct did not result in physical harm to the officers, it certainly created the risk of an escalation of the confrontation that could have resulted in violence.

Stotts' statements on Facebook shortly after breaching the Capitol Building show a total lack of remorse for his unlawful conduct.  He proclaimed he was "sick of" those who were working to uphold the result of the 2020 Presidential election and that his "side [would] prevail."  He referred to the riot as "the siege," and admitted entering into the Capitol "to strike fear into the sold out Congress."  Stotts also claimed the "[p]olice were aggressive and on the wrong side!" and announced, "They got us out but it's far from over!" These statements raise concerns that Stotts may intend to incite violence against "the wrong side" in the future.

Although Stotts admitted during his interview that he wished he had someone with him to talk him out of going into the building, his statements on January 6th expressed his belief at that time that his conduct and the conduct of the other rioters was justified. The nature of Stotts' offense weigh in favor of a custodial sentence.

### B.   The History and Characteristics of the Defendant

As set forth in the presentence report ("PSR," ECF No. 23), this is hardly Stotts' first encounter with the criminal justice system.  His most recent prior conviction, for driving with a revoked license and being uninsured, was in 2014, for which he was sentenced to 20 days in jail. PSR ¶ 32.  In 2012, Stotts was sentenced to 90 days in jail (88 days suspended), after pleading

guilty to disorderly conduct and obstruction. PSR ¶ 31. According to the PSR, police officers were issuing citations for underage alcohol consumption when Stotts disrupted their duties. The officers warned Stotts several times to back away from their patrol car and stand where directed. Stotts ignored their instructions and became belligerent. *See id.* Although more than nine years old, that behavior, also directed against law enforcement officers, bears resemblances to Stotts' conduct inside the Rotunda on January 6.

Stotts also has another conviction reflecting disrespect for the criminal justice system that dates back to 2007, when he was 18 years old. He violated the terms of his probation for a prior driving while impaired conviction and received a fourteen-day jail sentence in 2008. PSR ¶ 27. In 2007, Stotts pleaded guilty to driving with a revoked license and possession of liquor by a person under 21 and received a ten-day jail sentence. *Id.* ¶ 28. Stotts' not insubstantial but dated criminal history militates at least somewhat in favor of a custodial sentence. His prior probation violation demonstrates his inability to comply with the terms of a probationary sentence, and his prior short jail sentences show he has not been deterred from future criminal conduct.

### C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol Building and Grounds was an attack on the rule of law. As FBI Director Christopher Wray told the House Oversight and Reform Committee on June 15, 2021, "[t]he violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process." This factor supports a sentence of incarceration. The violence at the Capitol on January 6 was intended by many if not most of the rioters to disrupt, and did substantially disrupt, one of the most important democratic processes we have: the peaceful transfer of power. As one member of this Court has explained:

12

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble.  The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

*United States v. Paul Hodgkins*, 21-cr-188-RDM Tr. 7/19/2021 at 69-70 (statement of Judge Moss during sentencing). The attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

**D.     The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  The gravity of these offenses demands deterrence. This was not a lawful protest.  *See Hodgkins*, Tr. 7/19/2021 at 46 (statement of Judge Moss at sentencing: "I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). The sentences in these Capitol breach cases will convey to persons contemplating similar conduct in the future that their actions will result in substantial adverse consequences. General deterrence, then, is among the most important factors this Court should consider. *See United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized,

democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

*Specific Deterrence*

Stotts image scaling the walls of the Capitol Building was published by media outlets around the world, demonstrating both the seriousness and symbolic power of his criminal acts. Surveillance cameras captured Stotts inside the Capitol cheering on the crowd that broke through the Rotunda doors and paraded through the Rotunda.  In his Facebook posts, Stotts celebrated the violence of January 6th and expressed his belief that the police, who acted throughout the riot as a defensive force, were the aggressors on that day.  Specifically, he referred to January 6th as "[t]he story of the siege," in which he played an active role by "scaling a wall" to "strike fear" into Congress.  Despite his conduct and the conduct of those around him in the Rotunda, where he ignored the orders of the officers and stood his ground shouting at them, he claimed that the rioters "were peaceful," and the "[p]olice were aggressive and on the wrong side!"

Stotts' conduct on January 6, criminal history, and statements on social media demonstrate the need for specific deterrence.

### E.   The Need to Avoid Unwarranted Sentencing Disparities

As the Court knows, the government has charged hundreds of individuals for their roles in the Capitol riots, ranging from unlawful entry misdemeanors to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress. Each offender must be sentenced based on their individual circumstances, but with due regard that his conduct was part of the Capitol riot. Moreover, each offender's conduct can be placed on a scale of culpability, from that involving

non-violent, non-destructive trespass without encouraging violence or destruction by others, to conspiratorial crimes involving elaborate plans to commit acts of violence to prevent the certification vote.  The misdemeanor defendants will generally fall towards the lower end of that scale, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes, and a probationary sentence should not become the default for those offenses.[2] "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 (statement of Judge Lamberth during sentencing); *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 (statement of Judge Friedman at sentencing: "Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be. And I agree with that. Judge Hogan said something similar."); *United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 (statement of Judge Hogan at sentencing: "As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected").

While the number of sentenced defendants is low, the judges of this District and the government have acknowledged meaningful distinctions between offenders.  Those who committed felonies are generally more dangerous and deserve more substantial sentences of

---

[2] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its prior agreement to recommend probation in these cases. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

incarceration. Those who trespassed, but engaged in aggravating behavior, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating behavior, deserve a sentence more in line with minor incarceration or home detention.

After a review of the applicable Section 3553(a) factors, the government believes that Stotts' conduct falls in the second category.   He drove over 2,000 miles to D.C. to participate in the rally for then-President Trump.  He scaled a significant wall and then followed the crowd into the Capitol Building, cheered on those who were pushing past police officers, ignored their commands, and shouted in their faces.  He stayed in the Capitol Building for nearly an hour and later celebrated the breach, referring to it as a "siege" to strike fear into Congress.  Thus, Stotts should not be compared to those who obtained a probationary sentence and should be sentenced instead to 45 days of incarceration.

**V.      Conclusion**

Sentencing here requires that the Court carefully balance the various factors set forth in 18 U.S.C. § 3553(a).  Some of those factors support a sentence of incarceration and some support a more lenient sentence.  Balancing these factors, the government recommends that this Court sentence Jordan Stotts to 45 days of incarceration and $500 in restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY

By:      CHRISTOPHER D. AMORE
Assistant United States Attorney
Capitol Riots Detailee
NY Bar No. 5032883
U.S. Attorney's Office
555 4th Street, N.W., Room 5840
Washington, D.C.  20530
Office: (973) 645-2757
Christopher.Amore@usdoj.gov