```
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3       United States of America,      ) Criminal Action
                                        ) No. 21-cr-272
 4                      Plaintiff,      )
                                        ) SENTENCING HEARING
 5       vs.                            )
                                        ) Washington, DC
 6       Jordan Kenneth Stotts,         ) November 9, 2021
                                        ) Time:  10:00 a.m.
 7                      Defendant.      )
         _____
 8
                       TRANSCRIPT OF SENTENCING HEARING
 9                            HELD BEFORE
                     THE HONORABLE JUDGE TIMOTHY J. KELLY
10                     UNITED STATES DISTRICT JUDGE

11       _____

                           A P P E A R A N C E S
12
         For Plaintiff:      Christopher Amore
13                           DOJ-USAO, District of New Jersey
                             970 Broad Street
14                           Suite 700
                             Newark, NJ  07102
15                           (973) 645-2757
                             Email:  Christopher.amore@usdoj.gov
16
         For Defendant:      Michelle M. Peterson
17                           Federal Public Defender
                             625 Indiana Avenue, NW
18                           Suite 550
                             Washington, DC  20004
19                           (202) 208-7500
                             Email:  Shelli_peterson@fd.org
20
         Probation Officer: Carmen Newton
21       _____

22       Court Reporter:          Janice E. Dickman, RMR, CRR, CRC
                                  Official Court Reporter
23                                United States Courthouse, Room 6523
                                  333 Constitution Avenue, NW
24                                Washington, DC  20001
                                  202-354-3267
25
```

1          THE COURTROOM DEPUTY:  This is criminal matter

2     21-272, United States of America versus Jordan Kenneth Stotts.

3     Present for the government is Christopher Amore.  Present for

4     the defendant is Michelle Peterson.  Present from the

5     United States probation office is Carmen Newton.  Also present

6     is defendant Mr. Stotts.

7          THE COURT:  All right.  Good morning.  We are here

8     for the sentencing of Mr. Stotts, who has pled guilty to Count

9     4 of the information, charging him with parading,

10    demonstrating, or picketing in a Capitol building, in violation

11    of Title 40 U.S.C. § 5104(e)(2)(G).  I have received --

12    received and reviewed the presentence report, sentencing

13    recommendation from the probation office, and the sentencing

14    memoranda from the government and the defendant, including a

15    video clip that the government submitted to me.

16         Are there any other documents or materials for me to

17    review, Mr. Amore?  And you can address me from there.

18    Hopefully the microphone can capture you.  And you may remove

19    your mask when speaking.

20         MR. AMORE:  Thank you, Your Honor.  Good morning.

21    There are no other submissions from the government.

22         THE COURT:  Ms. Peterson, same question to you.

23         MS. PETERSON:  No, Your Honor.  No other documents

24    from us, either.

25         THE COURT:  And, like -- well, Ms. Peterson, you

1     don't have a microphone.

2              MS. PETERSON:  I don't have a microphone, so I will

3     hop up and down.

4              THE COURT:  I would extend to you the same courtesy,

5     if technologically it was possible.

6              Mr. Stotts, this sentencing hearing will proceed in

7     four steps, and all the while I want you to keep in mind the

8     seriousness of why we're here.  You committed and pled guilty

9     to a federal crime and today's proceeding is a about the

10    consequences you'll face as a result of your decision to commit

11    that crime.

12             The first step of today's hearing is for me to

13    determine whether you have received the presentence report and

14    whether there are any outstanding objections to that report

15    and, if so, to resolve those objections.

16             The second step is usually for me to determine what

17    sentencing guidelines and sentencing range applies to your case

18    based on your criminal history and based on a defendant's

19    criminal history.  But because you pled to a misdemeanor, the

20    sentencing guidelines don't apply here.  But even so, what I'll

21    just do as part of the second step is clarify the sentencing

22    framework as far as the statutes that we are operating under.

23             The third step is for me to hear from the government

24    and from your counsel and from you, if you wish to be heard

25    about your sentence.

1          And the last step requires me to fashion a just and

2     fair sentence, in light of the Congress -- the factors Congress

3     has set forth in 18 United States Code § 3553(a).  And as part

4     of this last step I will actually impose the sentence, along

5     with other required consequences of the offense.

6          So the final presentence report and sentencing

7     recommendation were filed in this matter on October 29th of

8     2021.  Does the government have any objection to any of the

9     factual determinations set forth in that report, Mr. Amore?

10          MR. AMORE:  Judge, no objection to any of the factual

11     determinations.  I did notice one minor correction that will

12     probably need to be made that pertains to restitution, in

13     paragraph 85.  Would you like me to address that now?

14          THE COURT:  No, let's -- maybe when you talk about

15     restitution we'll talk about that, especially if it's something

16     that -- well, all right, why don't -- I see Ms. -- I see

17     Ms. Peterson with a look on her face that suggests maybe we

18     should -- if it's going to be disputed, maybe it's easier to

19     mention it now.  I'm not saying she's necessarily disputing it.

20     But what is that, Mr. Amore?

21          MR. AMORE:  Yes, Your Honor.  I don't think it's

22     going to be disputed.  It's just in paragraph 85 it says

23     pursuant to 18 U.S. 3663(A), big A, which is the mandatory

24     Victims Restitution Act, that's not applicable in this case.  I

25     think that's even addressed elsewhere in this PSR.  So really,

1    it's just pursuant to 18 U.S.C. 3663(a)(3), where restitution

2    has been agreed to by the parties in the plea agreement.

3    That's all.

4            THE COURT:  Let me ask Ms. Peterson if she contests

5    that correction.

6            MS. PETERSON:  That has solved my quizzical look.  I

7    have no objection to that.

8            THE COURT:  Very well.  Ms. Peterson, any -- does the

9    defendant have any objection to any of the factual statements

10   set forth in the PSR?

11           MS. PETERSON:  No, Your Honor, except with respect to

12   the financial condition and ability to pay, that I believe was

13   added after the initial presentence report had been prepared

14   because the government had -- I'm sorry, the probation office

15   had not yet received Mr. Stotts's paperwork.  So I just want to

16   clarify for the Court.

17           THE COURT:  Which -- point me to the --

18           MS. PETERSON:  This is on page 14, that when

19   Mr. Stotts submitted his expenses and his income -- really,

20   it's the income that's at issue -- he reported it as if it was

21   a yearly salary and yearly income.  As the report notes in

22   other places, he has seasonal employment.  And this is the --

23   his income during approximately four months, the salary of the

24   year, when he is working in the landscaping business.  And the

25   five -- or, the greenhouses and the five to six months of

1   business income in the off-season -- which in Minnesota is a

2   lot longer than the off-season in Washington, D.C. -- he does

3   odd jobs and snow removal, things like that, so his income is

4   significantly less.  And I think that's only matters in terms

5   of if the Court is considering imposing a fine, I don't think

6   this properly reflects his actual monthly cash flow.

7          And I would note, in paragraph 66 -- I don't know if

8   this was in the original and I just missed it -- but it says he

9   has retained counsel.  He clearly does not have retained

10  counsel; he has me.

11         THE COURT:  We'll make the correction here, just

12  saying that the defendant is represented by counsel.  We'll

13  have -- and we'll have the other correction that Mr. Amore

14  mentioned, regarding restitution, corrected as well.

15         And then, really, it's not so much -- I guess,

16  Ms. Peterson, what you're saying is with regard to paragraph

17  65, more specifically, and the monthly income portion of that,

18  that that reflects his monthly income for a portion of the

19  year, maybe half the year or -- but not his monthly income

20  every single month.

21         MS. PETERSON:  Right.  And the months that are not,

22  his income is very little.

23         THE COURT:  Okay.  All right.  Is there any -- let me

24  ask, Mr. Amore, do you dispute -- do you dispute that?  I am

25  not -- I mean, I have not been -- the government hasn't asked

1   for a fine.  And other than the restitution, I was not really

2   thinking of going down that road, so I'm not sure it matters.

3   But just as far as for purposes of the facts laid out in the

4   PSR, Mr. Amore, do you have any dispute with, sort of, that, I

5   guess, clarification offered by Ms. Peterson?

6           MR. AMORE:  I don't, Your Honor.  Based on the way

7   the defendant has described his work for the probation officer,

8   I think that sounds reasonable.

9           THE COURT:  All right.  So, given, now, that neither

10  side has any objections, let me first ask Mr. Stotts,

11  Mr. Stotts, would you -- are you fully satisfied with

12  Ms. Peterson's representation of you?  You may take off your

13  mask.

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  All right.  And have you had enough time

16  to talk with her about the probation office's presentence

17  report and the papers that she filed and the government filed

18  in connection with your sentencing?

19          THE DEFENDANT:  Yes, Your Honor.

20          THE COURT:  All right.  I will then accept the facts

21  as stated in the presentence report.  And as with the few

22  corrections we've noted here, the presentence report will be my

23  findings of fact for purposes of this sentencing.

24          So as far as step 2 goes, I'm just going to go ahead

25  and lay out the statutory framework that applies in this case

1    and make sure the parties are all in agreement.

2            First, as a preliminary matter, Congress has imposed

3    a statutory maximum sentence for the offense to which

4    Mr. Stotts has pled guilty.  The statutory maximum is six

5    months imprisonment for this Class B misdemeanor.  As far as

6    supervised release goes, under 18 U.S.C. §§ 19 and 3583(b)(3),

7    supervised release is not applicable.  As far as probation

8    goes, under 18 United States Code § 3561(c)(2), the defendant

9    is eligible for up to five years of probation because the

10   offense is a misdemeanor.  And as far as fines go, the maximum

11   fine for the offense is $5,000.  There is also a mandatory

12   special assessment of $10 under 18 United States Code 3013(a).

13           So, let me ask both counsel whether I have accurately

14   stated the statutory framework under which we are operating

15   here.  Mr. Amore?

16           MR. AMORE:  Yes, Your Honor.

17           THE COURT:  Ms. Peterson?

18           MS. PETERSON:  Yes, Your Honor.

19           THE COURT:  All right.  I must now consider the

20   relevant factors that Congress set out in 18 United States Code

21   § 3553(a) and ensure that I impose a sentence that is, quote,

22   sufficient, but not greater than necessary to comply with the

23   purposes of sentencing, close quote.

24           Those purposes include the need for the sentence

25   imposed to reflect the seriousness of the offense, to promote

1    respect for the law, and to provide just punishment for the

2    offense.  The sentence should also afford adequate deterrence

3    to criminal conduct, protect the public from future crimes of

4    the defendant, and promote rehabilitation.  And I must also

5    consider the nature and circumstances of the offense, history

6    and characteristics of the defendant, the need for the sentence

7    imposed to comply with the purposes I just mentioned, the kinds

8    of sentences available, the need to avoid unwarranted sentence

9    disparities among defendants with similar records who have been

10   found guilty of similar conduct, and I have to consider the

11   need to provide restitution to the victims of the offense.

12          So, Mr. Amore, I will hear from you -- either where

13   you are, or if you would like to come to the podium, whatever

14   your preference is -- on the 3553(a) factors and the

15   government's sentencing recommendation.

16          MR. AMORE:  Thank you, Your Honor.  I'll step up to

17   the podium.

18          Your Honor, when looking at the 3553(a) factors, the

19   defendant in this case -- I think the Court should first look

20   at what the defendant did in his individual capacity, before

21   it's placed in the context of the January 6 Capitol riot.  And

22   the government sentencing memo set out -- set forth several

23   factors the Court should consider when sentencing January 6

24   defendants, but in Mr. Stotts' case, really, there's four

25   things the Court should consider:  First, how he gained entry

1    into the Capitol building; second, what he did once inside the

2    Capitol building; third, how long he remained in the Capitol

3    building, and; fourth, what he did afterwards.

4           So, first, how he gained entry into the Capitol

5    building.  You can see, on page 3 of the government's memo, you

6    see the defendant scaling the wall of the west terrace of the

7    Capitol building.  This isn't simply jumping over a bicycle

8    rack or hopping a fence; this is scaling what appears -- to me

9    it appears to be an approximately 20-foot wall, that certainly

10   not everyone is physically capable of doing.

11          And what he did afterwards, he entered the Capitol

12   building through the Senate wing door, which at the time he got

13   there that door was open.  However, just to the left of that

14   door there's a window, and that window had been broken open.

15   And at the time the defendant was entering through that Senate

16   wing door, you could clearly see, in video from the Capitol's

17   closed circuit TV, that there are individuals also entering the

18   Capitol building through that broken window.  Just to highlight

19   the point that scaling a 20-foot wall, entering a door that had

20   already been breached, while other people are entering through

21   the window, certainly shows that the defendant should have

22   known he should not have been doing what he was doing.  He knew

23   he should not have been doing what he was doing to gain access

24   to the Capitol building.

25          So, second, what he did once inside, he was in the

1   building.  There is a -- he -- he spent -- he first went to the

2   rotunda doors.  This is not the entrance, the way he came in.

3   There was another entranceway where other large group of

4   rioters had breached.  And there are photos of this entryway in

5   the government sentencing memo, as well.  And what you see here

6   in the video, you see the defendant cheering on the rioters who

7   are pushing past law enforcement that are trying to keep people

8   out at the rotunda doors.

9          So, you know, if the defendant is going to suggest

10  that he didn't know he shouldn't have been in there, he didn't

11  know he couldn't go in, I mean, he could visibly see others

12  pushing law enforcement out of the way so that the rioters

13  could all gain access to the Capitol.

14         He then spends most of his time in the rotunda of the

15  Capitol building.  There is a large mob in the rotunda, as

16  well.  For a lot of the time he was walking through the

17  rotunda, using his cell phone to take photos and videos.  But

18  at approximately 3:04 p.m. a large contingent of law

19  enforcement officers enter the rotunda; they're wearing riot

20  gear, they're wearing helmets, holding shields, some of them

21  are carrying batons.  They enter for the purposes of clearing

22  the rotunda, to put down the riot that was occurring right in

23  the center of the Capitol building.

24         And one would think at this point the defendant would

25  turn around and leave the Capitol building, faced with a mob of

1    law enforcement officers.  But he doesn't.  He proceeds to the

2    very front of the pack to confront these law enforcement

3    officers.  It's a confrontation that goes on for approximately

4    eight minutes from 3:04 in the afternoon to 3:12.  And the

5    defendant stands his ground.

6              He stays at the front of the pack.  The officers are

7    trying to clear the rotunda, they're pushing against rioters.

8    Some of the rioters are pushing back physically.  The defendant

9    in this case stands his ground.  You could see in the video I

10   submitted to the Court, which is Exhibit 1, which is a

11   90-second video that occurs between 3:07 and 3:08, not only is

12   he standing his ground, but he's shouting.  He starts singing

13   the national anthem.  He starts yelling at the officers and

14   refuses to leave.

15             That 90 seconds, I provided that to the Court because

16   that clearly shows the defendant, it gives the -- hopefully, it

17   gives Your Honor an idea of what I mean by the defendant stood

18   his ground.  But that's only 90 seconds.  This went on for

19   eight minutes.  There was -- in the larger CCTV video, that

20   captures the entire rotunda, although -- you know, you don't

21   see the defendant as clearly as you do in the body-worn camera

22   video.  You clearly see he remains at the front of that pack

23   for eight minutes, being pushed by law enforcement, refusing to

24   leave the rotunda.

25             Eventually he does leave, along with the rest of the

1    rioters that are in the Capitol, at approximately 3:12.

2            The third factor was having scaled the building.  He

3    entered through that Senate door at approximately 2:22.  And

4    he's eventually forced out of the rotunda at 3:12.  That's 50

5    minutes.  Almost an hour that the defendant stayed in the

6    building.

7            So what did the defendant do afterwards?  He went to

8    his social media, to his Facebook account.  And I provided Your

9    Honor with a sample of some of his postings.  To me, the most

10   striking one was this, he writes, "The story of the siege.  It

11   all started by scaling the wall as we broke into the U.S.

12   Capitol to strike fear into the sold-out Congress."  If there

13   was a question, any question as to why the defendant decided to

14   enter the Capitol building that day, I think that Facebook post

15   answers it:  To strike fear into Congress.

16           Another post, "We were peaceful, but the police were

17   not.  Police were aggressive and on the wrong side.  They got

18   us out, but it's far from over.  1776."

19           Then, finally, he wrote, "I got kicked out, but I'll

20   be back."

21           One other action he took afterwards -- which I don't

22   believe it's in my sentencing memo -- but he admitted, when he

23   sat down for his interview with the FBI, he admitted that the

24   photos and videos he had taken on his phone on January 6, he

25   had since deleted them off his phone.

1          In the defendant's submission, he suggests that

2     climbing the wall seemed like a challenge and that it was a

3     lapse in judgment.  I think his Facebook posts seem to counter

4     that.  He refers to it as a "siege," which a siege, from my

5     understanding, is a law enforcement or military operation to

6     surround a building, to choke a building from its supplies, to

7     shut down whatever is going on inside of that building.  And

8     also, like I said before, to instill fear into Congress.

9          The defendant also suggests in his memo that the

10    government concedes that Mr. Stotts committed no violent acts

11    or encouraged others to do so.  I don't think that's entirely

12    accurate.  The government sentencing memo does say that

13    Mr. Stotts did not directly physically strike any officers, but

14    remaining at the front of a crowd that is pushing up against

15    law enforcement, screaming in the officers' faces for eight

16    minutes, I think that any law enforcement officer who observed

17    that boldness, that brazenness, that aggressiveness would think

18    that there is -- if not violence, certainly a potential for

19    violence from someone behaving that way.

20         Moreover, he also cheered on the violence of others,

21    those that were storming through the rotunda doors, pushing

22    their way past law enforcement.  He was pumping his fist as

23    that was going on.

24         So, I don't think that this was just a lapse in

25    judgment, but a conscious decision to confront and interfere

1    with the law enforcement officers that were trying to shut down

2    a riot that was going on in the U.S. Capitol building on

3    January 6.

4           And as I transition now to -- from the seriousness of

5    the offense into the defendant's criminal history, Your Honor

6    will see that this is not the first time that this defendant

7    has had an issue with confronting law enforcement.

8           Although it's almost ten years ago, in 2012 he was

9    sentenced to 90 days in jail, 88 of which were suspended, after

10   he pled guilty to disorderly conduct and obstruction.  This is

11   in the PSR, paragraph 31.  And according to the write-up in the

12   PSR, local police officers were issuing citations for underage

13   drinking when the defendant disrupted their duties.  The

14   officers warned Mr. Stotts several times to back away.  He

15   ignored their commands and became belligerent.  Your Honor,

16   this seems very similar to Mr. Stotts's conduct inside the

17   Capitol.

18          Also, as noted in the PSR, in 2009 -- which, again,

19   is more than ten years ago -- but it reiterates the fact that

20   this is not the defendant's first encounter with law

21   enforcement.  He was charged with assault of a peace officer,

22   which eventually was dismissed.  This is at paragraph 29 of the

23   PSR, Your Honor, which states he was uncooperative with the

24   police, he refused to sit in the squad car, and then he tried

25   to run.

1    As noted in the defense's sentencing memo, he does

2    have other convictions that mostly seem to pertain to

3    alcohol-related offenses.

4    But, I think it's important to show that this

5    defendant in particular, unlike many of the other January 6

6    defendants, clearly has an issue with law enforcement.  He's

7    not afraid to confront law enforcement, not afraid to stand his

8    ground when law enforcement is trying to do their duties, not

9    afraid to yell in the face of law enforcement, and doesn't seem

10   to be deterred when law enforcement pushes him, gives him

11   directions.  He simply added to the numbers that were in the

12   rotunda that was making it difficult for law enforcement to do

13   their job that day.

14   And so, Your Honor, that's -- those are the

15   individual acts of the defendant.  Certainly, this has to be

16   looked at in the larger context of January 6th, which was an

17   attack on the Capitol, that achieved its objective to disrupt

18   the Congressional certification of the 2020 Electoral College

19   vote.  It threatened the peaceful transfer of power following

20   the 2020 election.  And, indeed, the defendant in this case

21   seemed to want to have some part of that, as indicated in his

22   messages that he was there to instill fear in Congress.

23   Again, this took place within the context of a large,

24   violent riot that relied on numbers to overwhelm law

25   enforcement officers.  And as I said before, he contributed to

1    those numbers by refusing to leave the rotunda when those

2    officers showed up in riot gear and gave directions for the

3    rioters to leave the rotunda.  The defendant refused to leave

4    for eight minutes.

5         And so while certainly deterrence is necessary in

6    this case -- we don't ever want to see what happened at the

7    Capitol happen ever again -- but we also don't want to see

8    people behaving this way towards law enforcement in any

9    context, whether it's the Capitol building, on the streets of

10   Washington, D.C., outside the White House, outside any of the

11   federal -- outside or inside any of the federal buildings in

12   the District of Columbia.

13        And so those are the reasons, Your Honor, why the

14   government is seeking 45 days of incarceration in this case.

15   The amount of time the defendant spent in the Capitol building,

16   his actions inside the Capitol building, his refusal to comply

17   with law enforcement, and his interference with law

18   enforcement's objectives in putting down the riot, and,

19   finally, his posts on social media after he -- after he was

20   kicked out of the Capitol building.

21        Subject to any questions Your Honor has, that's all I

22   have.

23        THE COURT:  Very quickly, Mr. Amore.  Obviously,

24   you've pointed out some of the more problematic parts of facts

25   for the defendant, both in terms of the offense and his history

1    and characteristics.  But, obviously, have to consider the flip

2    side of all of those things, right?

3                MR. AMORE:  Of course.

4                THE COURT:  I have to consider that he didn't --

5    there is no evidence of -- I won't go through all of them;

6    Ms. Peterson, I'm sure, will ably do that.  But, the fact that

7    he didn't have a weapon, the fact that he didn't appear to have

8    any real planning or was not a part of any other group, or all

9    those other things, I have to weigh those things, too, right?

10                MR. AMORE:  Of course, Your Honor.  And everything

11   you've said is accurate.

12                THE COURT:  And then the other thing I want to

13   mention, just as -- because you talked about some of these past

14   offenses.  I think the two -- in what you said, Mr. Amore, I

15   think you suggested that the offenses you highlighted here did

16   not involve alcohol -- or maybe by saying that other offenses

17   did involve alcohol, you suggested that the offenses you had

18   highlighted did not.  Does that make any sense?  But as I read

19   them, I think both the offenses you highlighted appear to also

20   stem from -- I mean, maybe the charges weren't about alcohol,

21   but if you read the narratives, they both appear to involve the

22   consumption of alcohol.  Is that fair?

23                MR. AMORE:  That's fair.  That is correct as well,

24   Your Honor, yep.

25                THE COURT:  So in that sense, I don't think there's

1    any evidence that Mr. Stotts was under the influence of alcohol

2    on January 6.  So in some sense, that does distinguish some of

3    these offenses from his conduct that day.

4           MR. AMORE:  I think that's right, Your Honor --

5           THE COURT:  You can kind of argue that both

6    directions.  But I think, as a matter of fact, that's true.

7           MR. AMORE:  I think that's right, Your Honor.  But

8    I'll just say, I don't -- with respect to the 2012 conviction

9    for disorderly conduct and obstruction, I don't -- I don't mean

10   to suggest that if alcohol was involved, it somehow excuses

11   that conduct or behaving that way towards law enforcement.

12          THE COURT:  And I'm not suggesting that either.

13   Okay.  Thank you very much.

14          MR. AMORE:  Thank you, Judge.

15          THE COURT:  Ms. Peterson, I will hear from you.

16          MS. PETERSON:  Thank you, Your Honor.  Let me start

17   with a couple of other things the government did not mention,

18   because I think some of what they did mention is fair.

19   Mr. Stotts acknowledges that he behaved terribly on January

20   6th.  One thing the government did not point to, however, is

21   what Mr. Stotts did ten days later, and that is he voluntarily

22   turned himself in to law enforcement.  They didn't come out to

23   arrest him; he called them and went to the station.  They

24   offered to come to him, he said no, he would come to them.

25          He went to them, he wore the same clothing that he

1    wore on the day of January 6th.  He gave them a full

2    confession.  And I have -- I've listened to the entire thing.

3    He never raises his voice, he is never disrespectful in any

4    way, shape, or form throughout that interview.  He makes no

5    excuses for his actions, takes -- accepts full responsibility

6    for it.  And, in fact, the agents thank him for that in the

7    course of the interview and tells him -- makes a point of

8    telling him they don't consider him a threat and they have no

9    evidence that he committed any violent acts.  And they then let

10   him leave and he goes back home.  They ask him for how to reach

11   him, if they need to reach him in the future, he provides that

12   information, he remains available to them.  And it's two months

13   that go by before there is any arrests at all.

14         The tenor of that interview -- and perhaps we should

15   have played it, but I don't think the government would disagree

16   with this -- was completely polite, respectful, he was full of

17   contrition and remorse and the agents were, likewise, very

18   respectful towards him and made him feel comfortable telling

19   them exactly what occurred that day, and that is what he did.

20         So I think you have to weigh that in when you're

21   comparing his actions.  And other than in that immediate

22   aftermath of January 6th, whether we acknowledges he posted

23   things that he shouldn't have posted and he made comments that

24   certainly made it seem as if he was proud of what he had done

25   on that day, upon reflection, after he left, his complete

1    attitude changed.  And this is not a situation where he deleted

2    his Facebook accounts and deleted posts in order to prevent law

3    enforcement from seeing them.  First of all, everyone knows

4    that that's not an effective way of destroying evidence.

5              THE COURT:  Not everyone knows.

6              MS. PETERSON:  Most people know that's not an

7    effective way of destroying evidence.  But more importantly, he

8    did it, as he indicated and as he told law enforcement, because

9    he had a conversation with his father, realized how stupid he

10   had been and didn't want to participate in that anymore.

11             Mr. Stotts is not someone who has ever gone to a

12   protest before or a political rally; was not his intention

13   even.  He was, as I've noted in my sentencing memo, he was in

14   his off-season, he was in Arizona, he decided to go visit his

15   father.  He travels around in his vehicle, sleeps in his

16   vehicle in the off season.  And he was driving to Florida,

17   heard about then-President Trump inviting people to come to the

18   Capitol and suggesting that everyone should come to show their

19   support, and he decided to come.

20             Came on his own.  He didn't have any plans in

21   advance.  He stayed outside of the city and came in to do some

22   sightseeing two days before the rally, the 4th.  On the 5th he

23   came in for the rally that evening, then he went back out where

24   he was staying, and then came back in for the speeches on

25   January 6th.

1          He had no intention of going to the Capitol and

2     there's nothing that suggests that he did.  And he also had no

3     intention of engaging in any criminal actions prior to coming.

4     He didn't come with weapons, he didn't come with even defensive

5     gear.  He had -- he had no camouflage clothing, he had no gas

6     masks, he had no bear spray, no pepper spray, no weapons of any

7     sort.  That doesn't excuse what he did, which is he got caught

8     up in what was going on and he played a role in that, and he

9     acknowledges that.

10          I didn't mean to, in describing his scaling of the

11     wall -- as you saw it, as a challenge -- to suggest that

12     somehow appropriate.  He knows it wasn't.  That's how he would

13     describe to the Court how stupid it was.  And yet, when he saw

14     people doing it, I'm an able-bodied young man, I can do that,

15     too.  It wasn't as if he couldn't just walk up the steps and

16     walk in the door; that's what a lot of other people were doing.

17     So it wasn't a maneuver to designed to do something more

18     nefarious, if you will.  It was a way to get where he was

19     going, along with everyone else.

20          And he's -- I know the government said that the

21     defendant somehow never -- that what he did showed that he

22     didn't know that he couldn't go in.  We have never suggested

23     that.  Mr. Stotts did not suggest to the police when he -- or

24     to the FBI when he interviewed with them, nor did we suggest

25     that he didn't know that he wasn't supposed to go in.  He fully

1    knew that.  He has acknowledged that in pleading guilty.  You

2    can't plead guilty to the offense you pled guilty to.  And his

3    statement of offense acknowledges that he knew that he was not

4    supposed to be in the Capitol that day.

5           So that's -- that's never been an issue.  It's really

6    trying to get into his -- we've been trying to explain to the

7    Court why he did what he did and what he was thinking at the

8    time, which was, quite frankly, that he wasn't thinking.  He

9    got caught up in the moment.  And I think, as the Court has

10   already noted with respect to the criminal history, it is, as

11   I've said in my sentencing memo, ten years old and it does all

12   stem from when he was using alcohol.

13          As my sentencing memo outlines, he left his home at a

14   very young age.  He's lived a very solitary life.  He does have

15   family, but he is really on his own.  And he went through a

16   period of time when he was drinking and making bad decisions as

17   a result.  And now, in fact, the only group he's a member of is

18   a religious group that he goes to and does bible study with.

19   He's not part of any organized effort to express his political

20   views one way or the other.  Not that there's anything wrong

21   with that, but I think it does explain a little bit more the

22   different posture he was in than many people who came on

23   January 6th.  And, again, he came with no intention of going

24   into the Capitol, that was -- he didn't -- he had no -- if

25   someone else was planning that, it was not him, and he did not

1    know what he did following along and regrets that.

2            There is no doubt, and Mr. Stotts has seen the video,

3    that where he is being -- I would agree with the government's

4    characterization of it -- I would say obnoxious, but

5    belligerent works as well.  He was singing loudly in the face

6    of the officers.  And, again, that is -- he recognizes how

7    wrong his behavior was; it was disruptive, it could have

8    instilled fear in people, and it's nothing -- he makes no

9    excuses for it.

10            But I think you have to view that in the overall --

11    that is a short period of time while he's in the Capitol.  And

12    the government has noted that he was in there for 50 minutes.

13    You can trace his steps in that CCTV footage and you do not see

14    him commit any violence, you do not see him commit any

15    destruction of property.  Wanders through.  Does he get caught

16    up in the moment, start singing the national anthem loudly and

17    obnoxiously?  Yes, and he has acknowledged that.

18            I think the difficult question for this Court is, in

19    looking at this, it is a Class B misdemeanor.  Certainly, in

20    the history of this courthouse, it is rare for someone who is

21    convicted, prior to January 6, of a Class B misdemeanor, to be

22    incarcerated.  I think that sentencing disparity is a hard

23    issue to face here because there's already sentencing disparity

24    on these cases.  There have been, as I indicated in my

25    sentencing memo, and I'm sure the Court is well aware of,

1    sentences ranging from two months probation with a fine all the

2    way up to the six months probation and up to three years of --

3    I'm sorry, six months confinement or up to three years of

4    probation, sometimes with home confinement, sometimes without

5    home confinement.  And while the government tries to thread the

6    needle and explain why one case deserves home confinement and

7    another doesn't, why one deserves 30 days of incarceration,

8    another, perhaps, 45 days of incarceration, it's very difficult

9    to look at these cases and, really, come up with a matrix with

10   every case, where it ought to be.

11          So, Mr. Stotts is asking the Court to sentence him to

12   a period of probation with, if the Court believes necessary,

13   home confinement.  I'm not sure how much home confinement.

14   Judge McFadden pointed out, in a case where the government was

15   asking for home confinement, these are not cases that home

16   confinement is necessary so that he doesn't commit another

17   crime.  It's winter in Minnesota, Mr. Stotts will spend most of

18   it indoors anyway, as anyone, like myself, who grew up in

19   Minnesota knows.

20          There's not a lot of punishment to home confinement,

21   and I get that, but there's also not a lot to be gained with

22   respect to deterring Mr. Stotts.  There's no reason to believe

23   he will commit this act again, given his lack of planning, his

24   lack of intent of when he came to the Capitol, doing anything

25   like that.  While, frankly, there's nothing wrong with going to

1    political protests at all, he doesn't do that.  There was a

2    one-time event for Mr. Stotts.  So we would ask the Court to

3    sentence him to a period of probation.

4              THE COURT:  Ms. Peterson, just clarify a couple

5    things for me.  It was -- I think it was ten days later that

6    he --

7              MS. PETERSON:  Yes.

8              THE COURT:  -- called the FBI or the police?

9              MS. PETERSON:  Yes, that is correct, Your Honor.  He

10   called them and then they made an arrangement for him to come

11   in.  I believe he called on January 16th, according to the FBI

12   reports, which is ten days later.  Then he came in, I believe,

13   the next day, or two days later.  He came when they told him to

14   come.

15             THE COURT:  In the Facebook posts, I think the

16   government says something like in the hours afterward.

17             MS. PETERSON:  That is correct.

18             THE COURT:  We're talking about within 24 hours of

19   the -- of January 6?

20             MS. PETERSON:  That is correct, to the immediate

21   aftermath of what happened that day.

22             THE COURT:  And is Mr. Stotts going to address me

23   today?

24             MS. PETERSON:  Yes, Your Honor.

25             THE COURT:  All right.  All right.  Mr. Stotts, if

1   you have -- you have the right to make a statement or present

2   any information to me you would like to mitigate your sentence.

3   And so, if you would like to address me, please approach the

4   podium.  And you may remove your mask, sir.

5           THE DEFENDANT:  Thank you, Your Honor.  Plain and

6   simple, I broke the law.  You know, I need to be held

7   accountable.  I know that's the way of the world, that's what

8   keeps the world safe.  And I'm ashamed of what I've done.  So

9   experience has been a reality check for me.  Made me realize

10  how necessary it was to figure things out and be a better

11  person, moving on.  I just want to put this all behind me and

12  just move on with my life.

13          THE COURT:  All right.  Thank you.  Thank you very

14  much.  You may be seated.

15          MR. AMORE:  Judge, may I just say one thing very

16  quickly in response to what Ms. Peterson said about the

17  defendant contacting the FBI?  That is true, but I want to make

18  sure it's clear he was first approached by the FBI and given

19  their contact information.  And he did, on his own, reach out

20  to the FBI to say, Okay, I will come and speak with you.  But I

21  don't believe it's that he just, ten days later, picked up the

22  phone and called the FBI and said, Hey, I want to come talk to

23  you.

24          THE COURT:  He was approached by the FBI and said --

25  how was he -- I mean, can you give me a little more context?

1          MR. AMORE:  He -- I believe he was called by the FBI

2     and then he called them back to say can we -- can I speak to

3     you?  But I would like to speak with you somewhere private, not

4     at my residence.  Can I come to a local police station and

5     speak with you?  I believe that's how it went.

6          THE COURT:  Ms. Peterson, do you -- can you -- I

7     mean, given how you presented it, in terms of he picked up the

8     phone, that's not, obviously, quite how you had presented it.

9          MS. PETERSON:  If the government has -- if that's

10    what the government says happened, I can't dispute that.  I

11    don't know.  If there -- I believe I saw in the record that

12    there was a -- he had reason to believe, obviously, that they

13    wanted to talk to him.  I thought that I saw that they had

14    called his brother, or something along those lines, and then he

15    called them.  But in any event, yeah, I'm not --

16          THE COURT:  Maybe the brother had received a call or

17    somebody and he became aware of it?

18          MS. PETERSON:  Without having it in front of me, I

19    wouldn't swear to anything, exactly how it transpired.  But,

20    yes, he didn't do it without any sort of suggestion that they

21    wanted to talk to him.  But he did call them and arrange to go

22    in and see them.

23          THE COURT:  All right.  All right.  Mr. Amore,

24    anything to add on that?  It sounds like he became aware,

25    perhaps, of some -- I'm not sure that it matters very much

1    because the reality is, he did follow up.  And --

2                MR. AMORE:  Correct.

3                THE COURT:  -- the bigger picture is, we are here

4    today because he wanted to take responsibility early, and he

5    did so by pleading guilty.  There are -- there have only been a

6    handful of sentencings so far -- I don't know, maybe 20, maybe

7    that's more than a handful -- still, in the greater scheme,

8    that's early acceptance of responsibility, however you want to

9    slice it.  So, I'm not sure that matters.

10               All right.  Well, I have assessed the particular

11   facts of this case in light of the relevant 3553(a) factors and

12   I'm going to provide my thoughts for the record and for you,

13   Mr. Stotts, on how each of these factors weigh in this case.

14               Let me begin with my considerations with regard to

15   the nature of the offense.  This is the hardest thing that, I

16   think, in these cases, that me and many of my colleagues have

17   to wrestle with, because what happened that day, on January

18   6th, was in some ways as serious as an offense can be, given

19   that it threatened the peaceful transfer of power from one

20   president to another.

21               The damage that was done that day was both tangible

22   and intangible.  You had a role, but you had a limited role.

23   So let me just say a few things about the overall events of

24   January 6th, insofar as I have to consider the nature and

25   circumstances of the offense.

1          Mr. Stotts, our Constitution and our laws give you

2     rights that people in other countries would do just about

3     anything for, and that our predecessors, our ancestors here in

4     America have died for.  You have the right to vote for whoever

5     you want to for president.  You have the First Amendment right

6     to speak out in favor of your candidate, put up signs to

7     convince your friends and neighbors to vote for him or her.

8     And if you don't like how an election is being conducted, you

9     can speak out about that, too.  You can call or write or meet

10    with elected officials in your state or in the federal

11    government.  You can try to get election laws changed, if you

12    don't like them.  You can always engage in peaceful protest.

13    And if you think you've been wronged and you have a case, you

14    can file a lawsuit in state court or here in federal court.

15          But, freedom means that with those rights come

16    responsibilities.  So what you cannot do is become part of a

17    mob that uses violence and the threat of violence disrupts

18    Congress's ability to fulfil its role to process the

19    certification of the Electoral vote for college -- Electoral

20    vote for president.  What you cannot do is engage in a mob to,

21    in your words, strike fear into our elected officials in that

22    moment.

23          What happened that day was not only damage property

24    and hurt people, real people, it was a blow against customs and

25    practices that help support the rule of law and the

1    Constitution.  It broke our tradition of the peaceful transfer

2    of power.  And so, it was more than extremely serious.  In my

3    view, it was a national disgrace.  And you played a role in

4    that.  But as I said, you had a limited role.  You weren't part

5    of any group, there's no evidence that you planned anything,

6    you did not engage in violence against people or property, you

7    didn't bring a weapon.  And however you became aware that the

8    police wanted to talk to you, you made yourself available very

9    quickly thereafter and submitted to an interview, took

10   responsibility, and here we are today, with you being, you

11   know, let's say one of the first 20 or 25 people or so to be

12   sentenced.

13          Now, there are -- that limited role is a positive for

14   you.  But, the government fairly points out some of the things

15   with regard to your involvement that are not so positive.  You

16   didn't leave when you were ordered to leave the Capitol.  You

17   scaled a wall to get in the building.  You stayed almost an

18   hour.  And the social media posts, you posted some things on

19   social media that made it seem that you were proud of what

20   happened and, honestly, that you might do it again.

21          So, there's a lot to be said for what went on that

22   day and how bad it was and how serious it was.  And while much

23   of your role was limited, there are some things there that are

24   cause for concern and that weigh against you.

25          As far as your characteristics as an offender go,

1    we've talked about your past, your convictions.  Most of them

2    are old and most of them can be linked one way or the other to

3    alcohol, it seems to me.  That's not an excuse, no one is

4    offering that as an excuse, but it puts them in context.

5         But another part of your characteristics as an

6    offender, it seems to me, is your willingness to take

7    responsibility early here.  When you addressed me here today, I

8    believe you that you feel remorse for what happened.  You made

9    no bones about it, you made no excuses.  And that's consistent

10   with what your attorney has said your approach here has been

11   all along.  And to me, that means a lot, and that says a lot

12   about where you're headed from here and whether you're likely

13   to engage in any of this conduct in the future.  I weigh that a

14   lot, as I said.

15        Other than the history -- the nature of the -- the

16   nature of the offense and your characteristics as an offender,

17   I have to weigh -- let me tie this off about your

18   characteristics as an offender.  Again, like the nature of the

19   offense, I think there are some strong things you have in your

20   favor here in context, but a few other things that are cause

21   for concern.  It's not quite the same than if you showed up

22   here in court with no record at all, is the reality.

23        The next factor that I have to consider is that the

24   sentence has to reflect the seriousness of the offense, to

25   promote respect for the law, to provide just punishment, to

1    afford adequate deterrence to criminal conduct, to protect the

2    public, and to promote rehabilitation.  I do think, when I look

3    at -- and this is another piece, another part of this

4    sentencing that I think my colleagues and I are going to be,

5    you know, carefully considering in each of these cases as we go

6    forward, and it's difficult.  I don't think, at the end of the

7    day, if I were to just give you probation and no other --

8    nothing else, just straight probation for some very short

9    period of time, let's say, I'm not sure that does capture how

10   bad, even given your limited role, how bad, how serious the

11   offense was and whether that really does provide adequate

12   deterrence.  It's -- again, it's difficult.

13         We've talked about the types of sentences available.

14   I can -- about how much probation you're eligible for.  And,

15   obviously, you're eligible for up to six months incarceration.

16   Government has asked for 45 days of incarceration, your

17   attorney has asked for -- you have asked for probation.  We

18   talked about those things.

19         I have to consider unwanted sentence disparities.

20   Usually that's something the sentencing guidelines kind of help

21   inform the judge about.  Here, there are no sentencing

22   guidelines and the event here is so unusual that I'm not sure

23   what the -- how the guidelines would have helped anyway.  But

24   in any event, I certainly have studied closely, to say the

25   least, the sentencings that have been handed out by my

1    colleagues.  And as your attorney has pointed out, you know,

2    maybe, perhaps not surprisingly, judges have taken different

3    approaches to folks that are roughly in your shoes.

4         And then, last, I have to consider the need to

5    provide restitution.  And, of course, as part of the sentence I

6    am going to order the $5,000 worth of restitution that the

7    Court has --

8         MS. PETERSON:  $500.

9         THE COURT:  $500, pardon me.  $500 worth of

10   restitution that the parties have agreed is appropriate in this

11   case.

12        I think it's a close call.  I think, you know,

13   Mr. Stotts, as I've said, I think you have a lot of positives

14   here.  I think the only things that make it somewhat close are

15   your scaling of that wall, the dramatic nature of that, and the

16   fact that you have a criminal record in which -- well, that you

17   have a criminal record that has wound you up in jail for short

18   periods of time on occasion; very short, though.  But I think,

19   to me, your remorse, your genuine remorse and the fact that

20   we're here very early -- it doesn't seem, maybe, very early,

21   given that this happened in January, but relative to other

22   defendants, relative to the difficulties I think, probably, the

23   Department of Justice has had in trying to figure out how to

24   make plea offers that reflect all these factors.

25        I am going to sentence you to 24 months of probation.

1    I'm going to have -- I'm going to subject you to home detention

2    for 60 days.  So you won't be able to leave your home, except

3    for -- we'll go through it -- except for a very limited amount

4    of -- very limited reasons, for 60 days.  As Ms. Peterson says,

5    perhaps that's not as much of a punishment as it would be in

6    Miami.  But I think it's appropriate.

7           I would order the $500 of restitution that the

8    parties have agreed on.  And, Mr. Stotts, I'm going to ask

9    you -- order you to complete 60 hours of community service as a

10   part of your -- as a condition of your probation.

11          So, Mr. Stotts, why don't you come up here and stand

12   up here with Ms. Peterson up at the podium.

13          So, I will now impose the sentence which I conclude,

14   after considering all the 3553(a) factors, is sufficient, but

15   not greater than necessary, to comply with the purposes of

16   sentencing.

17          Pursuant to the Sentencing Reform Act of 1984, and in

18   consideration of the provisions of 18 United States Code 3553,

19   it is the judgment of the Court that you, Jordan Stotts, are

20   hereby sentenced to a term of 24 months of probation on Count

21   4.  In addition, you are ordered to pay a special assessment of

22   $10 in accordance with 18 United States Code 3013.  While on

23   supervision you shall abide by the following mandatory

24   conditions, as well as the standard conditions of supervision

25   which are imposed to establish the basic expectations for your

1    conduct while on supervision.

2         The mandatory conditions include:  One, you must not

3    commit another federal, state, or local crime.  Two, you must

4    not unlawfully possess a controlled substance.  Three, the

5    mandatory drug testing condition is suspended based on my

6    determination that you pose a low risk of future substance

7    abuse.  Four, you must cooperate in the collection of DNA as

8    directed by the probation officer, and; five, you must make

9    restitution in accordance with 18 United States Code § 3663,

10   and 3663(a), or any other statute authorizing a sentence of

11   restitution.

12        You shall also comply with the following special

13   conditions:  You are ordered to make restitution to the

14   Architect of the Capitol in the amount of $500.  The Court

15   determined you do not have the ability to pay interest and,

16   therefore, waives any interest or penalties that may accrue on

17   the balance.

18        Restitution obligation:  You must pay the balance of

19   any restitution owed at a rate of no less than $100 per month.

20        Given what you've told me, Ms. Peterson, about his

21   ability to pay, if that needs to be adjusted, the parties can

22   approach me about adjusting it, but --

23        MS. PETERSON:  Thank you, Your Honor.

24        THE COURT:  -- leave that alone for the moment.

25        Financial payment:  You must pay the financial

1    penalty in accordance with the schedule-of-payments sheet of

2    the judgment.  You must also notify the Court of any changes in

3    economic circumstances that might affect the ability to pay

4    this financial penalty.

5          Financial information disclosure:  You must provide

6    the probation officer access to any requested financial

7    information and authorize the release of any financial

8    information.  The probation office may share financial

9    information with the United States Attorney's Office.

10   Restitution payments shall be made to the Clerk of the Court

11   for the United States District Court, District of Columbia, for

12   disbursement to the following victim:  The victim's name is the

13   Architect of the Capitol, Office of the Chief Financial

14   Officer, Attention:  Kathy Sherrill, S-H-E-R-R-I-L-L, CPA, Room

15   H2-205B, Washington, D.C. 20515, and the amount of loss is

16   $500.

17         The financial obligations are immediately payable to

18   the Clerk of the Court for the U.S. District Court, 33

19   Constitution Avenue Northwest, Washington, D.C.  20001.  Within

20   30 days of any change of address you shall notify the Clerk of

21   the Court of the change until such time as the financial

22   obligation is paid in full.

23         As I mentioned, so for 60 days you will be subject to

24   location monitoring.  The defendant will be monitored by the

25   form of location monitoring technology indicated herein for a

1    period of 60 days and he must follow the rules and regulations

2    of the location monitoring program.  The cost of the program is

3    waived.  Location monitoring technology is at the discretion of

4    the probation officer, including radio frequency, or RF

5    monitoring, GPS monitoring, including hybrid GPS Smart-Link or

6    voice recognition.

7            The form of location monitoring technology will be

8    used to monitor the following restrictions on the defendant:

9    Movement in the community; the defendant is restricted to his

10   residence at all times, except for employment, education,

11   religious services, medical, substance abuse or mental health

12   treatment, attorney visits, court appearances, court-ordered

13   obligations, or other activities as pre-approved by the

14   officer.

15           And as I also mentioned, then you must complete,

16   also, 60 hours of community service.  Probation officer will

17   supervise the participation in the program by approving the

18   program, and you must provide written verification of the

19   completed hours to the probation officer.

20           I will also authorize supervision and jurisdiction of

21   this case to be transferred to the United States District Court

22   for the District of Minnesota.

23           The probation office shall release the presentence

24   investigation report to all appropriate agencies, which

25   includes the United States Probation Office in the approved

1      District of residence, in order to execute the sentence of the

2      Court.

3             Treatment agencies shall return the presentence

4      report to the probation office upon the defendant's completion

5      or termination from treatment.

6             Pursuant to 18 United States Code 3742, you have a

7      right to appeal the sentence imposed if the period of

8      imprisonment is longer than the statutory maximum.  If you

9      choose to appeal, you must file any appeal within 14 days after

10     I enter judgment.  And as defined in 28 United States Code

11     2255, you also have the right to challenge the conviction

12     entered or sentence imposed if new and currently unavailable

13     information becomes available to you, or on a claim that you

14     received ineffective assistance of counsel in entering a plea

15     of guilty to the offense of conviction in connection with

16     sentencing.  And if you are unable to afford the cost of an

17     appeal, you may request permission from the Court to file an

18     appeal without cost to you.

19            And, finally, pursuant to the D.C. Circuit's opinion

20     in *United States versus Hunter*, 809 F.3d 677, decided on

21     January 12th, 2016, are there any objections to the sentence

22     imposed that are not already noted on the record, Mr. Amore?

23            MR. AMORE:  No, Your Honor.

24            THE COURT:  Ms. Peterson?

25            MS. PETERSON:  No, Your Honor.  Thank you.

1          THE COURT:  All right.  All right.  This concludes my

2      judgment in this case.  I expect -- I guess I'll have a motion

3      from the government to dismiss additional counts?

4          MR. AMORE:  That's correct, Your Honor.  The

5      government would move to dismiss Counts 1, 2, and 3.

6          Do you need a written motion?

7          THE COURT:  No.  That's fine.  I will grant that

8      motion.  We will dismiss those counts.

9          Mr. Stotts, as I said, based on your -- the way you

10     addressed me here today and given your record, which is not

11     perfect, but is -- doesn't suggest to me that you're going to

12     be -- you're going to have a hard time moving on or putting

13     this behind you, I wish you good luck in doing that.

14          The community service, I think, is a valuable way to

15     give back to the community when, perhaps, you're making up for

16     something you've done to damage our national community in some

17     way.  But based on the way you addressed me here today, I feel

18     confident you're going to be able to do that and, you know,

19     move on with your life in a positive way.  So, good luck to you

20     going forward.  The case is going to be transferred to

21     Minnesota, so you may not -- if all goes well, you won't be

22     appearing before me again.

23          Mr. Amore, is there anything else you think I need to

24     address here today?

25          MR. AMORE:  No, Your Honor.  Thank you.

1              THE COURT:  All right.  And Ms. Peterson?

2              MS. PETERSON:  No, Your Honor.  Thank you.

3              THE COURT:  Good luck, sir.  Parties are dismissed.

4                           *   *   *

5

6

7

8

9          CERTIFICATE OF OFFICIAL COURT REPORTER

10

11      I, JANICE DICKMAN, do hereby certify that the above and

12   foregoing constitutes a true and accurate transcript of my

13   stenographic notes and is a full, true and complete transcript

14   of the proceedings to the best of my ability.

15                   Dated this 13th day of November, 2021

16

17

18              _____

19              Janice E. Dickman, CRR, CMR, CCR
                Official Court Reporter
20              Room 6523
                333 Constitution Avenue, N.W.
21              Washington, D.C.  20001

22

23

24

25